# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANGELITA KILBURN and STEVEN TIMOTHY KILBURN, as Co-Executors of the Estates of PETER C. KILBURN, and BLAKE KILBURN deceased,<br><br>Plaintiffs,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN *et al.*,<br><br>Defendants. | Civil Action No.    01-1301(RMU)<br><br>Re Document No.:   117 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

1.      The plaintiffs bring this action pursuant to the "terrorism exception" to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.  Am. Compl. ¶ 28-31.  The case arises out of the kidnapping of Peter C. Kilburn in late November or early December 1984, his subsequent sixteen month period as a hostage, and his April 1986 murder.  Id. ¶ 14-18.  At the time he was abducted, Peter Kilburn was a librarian and instructor of library sciences at the American University of Beirut ("AUB") in Beirut, Lebanon, a position that he had held for over 20 years.  Id. ¶ 14; Pls.' Proposed Findings of Facts & Conclusions of Law ("Pls.' Proposed Facts") ¶ 1.

2.      Peter Kilburn's brother, Blake Kilburn, filed suit in June 2001, on behalf of Peter's estate and on his own behalf against the Islamic Republic of Iran ("Iran") and its Ministry of Information and Security ("MOIS") (collectively the "Iranian defendants"), as well as the Socialist Peoples' Libyan Arab Jamahiriya ("Libya") and the Libyan External Security

Organization ("LESO") (collectively the "Libyan defendants"). *See generally* Compl. Following Blake's death in January 2006, his wife Angelita and his oldest son, Steven Timothy Kilburn, were substituted as co-plaintiffs and co-executors of both Peter's and Blake's estates. Minute Entry (Sept. 21, 2006). In February 2009, the court, on the plaintiffs' motion, dismissed all claims against the Libyan defendants so that the plaintiffs could recover settlement funds from Libya via procedures established in the Libyan Claims Resolution Act ("the Act") Pub. L. No. 110-301, 122 Stat. 2999 (2008). *See* Mem. Op. (Feb. 26, 2009). On July 30, 2009, the plaintiffs advised the Court that $10,000,000 had been paid to their counsel for the benefit of the plaintiffs as a result of that dismissal and the Act. *See* Notice (July 31, 2009). The Iranian defendants, by contrast, have never participated in this case and as a consequence, default was entered as to them on March 3, 2005. *See* Entry of Default (Mar. 2 2005). Accordingly, the court ordered the plaintiffs to submit the necessary motions and materials to support the entry of a default judgment pursuant to Rule 55(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1608(e). *See* Minute Order (June 25, 2009); Minute Order (July 21, 2009). The plaintiffs have now moved for judgment by default and submitted proposed findings of fact and conclusions of law. *See* Pls.' Mot. for Default J.; Pls.' Proposed Facts.

## II. FINDINGS OF FACT

### A. Factual Background

#### 1. Peter Kilburn

3.      Peter Kilburn was born on February 10, 1928, in Berkeley, California. *See* Pls.' Proposed Facts, Ex. 1, Dep. of Blake Kilburn ("Kilburn Dep.") at 6:13-7:2, attached hereto as Exhibit 1. As such, Peter was a United States citizen all of his life. *Id.* at 7:2-3.

4.      Blake Kilburn was Peter's younger brother and his only sibling. He was born in San Francisco, California and was also a United States citizen his entire life. *Id.* at 6:4-7:3.

5.      Peter grew up during the Great Depression and his father died when he was young, leaving his mother to raise both he and Blake by herself.  *Id.* at 7:6-16.  Peter's mother was a nurse, and brought home a "very modest" income, so, in the words of Blake, "times were tough."  *Id.*  Despite the difficult economic times, the family had a "very happy life."  *Id.* at 7:13-16.

6.      Growing up primarily in Berkeley, California, Peter was a serious and bookish child, but he was immensely popular in school and had many friends.  *Id.* at 7:19-21, 8:1-9.  More importantly, Peter was an excellent student who consistently achieved high grades and won the admiration of his teachers.  *Id.* at 7:21, 8:10-18.  Peter Kilburn loved learning and his focus on academia eventually led to a career in library sciences.  *Id.* at 8:10-18, 13:9-17.  Also, remarkably, by adulthood, Peter had learned to speak seven languages.  *Id.* at 20:12.

7.      Peter had incredibly poor eyesight and wore eyeglasses from early childhood.  *Id.* at 8:20-9:1.  The Kilburn family thought that Peter's poor eyesight would preclude him from being drafted into military service during World War II or at least limit his military service in some way.  *Id.* at 9:20-21:3.  Nevertheless, Peter was drafted into the United States Army Infantry as a rifleman.  *Id.* at 10:3-4.  Coincidentally, Peter hated guns while growing up and would not have anything to do with firearms.  *Id.* at 10:4-8.  However, Peter ultimately took to his role in the Army, obtaining a sharp shooter's badge and becoming the driver of a half-track.  *Id.* at 10:9-11.  According to Blake Kilburn, Peter's "life changed" while in the Army and that this transformation was indicative of Peter Kilburn's ability to "adapt to any circumstances."  *Id.* at 10:12-13.

8.      Peter Kilburn served with distinction in the Army infantry during World War II, earning a combat infantryman's badge, a good conduct commendation, and most importantly, a

Bronze Star. *Id.* at 10:16-11:10. He fought on Guadalcanal and several other islands in the Pacific before taking part in the invasion of the Philippines. *Id.* at 10:16-11:3.

9. After his service, Peter Kilburn enrolled in the University of Washington. *Id.* at 12:3-7. While a student, Peter acted as the best man in Blake's wedding in Portland, Oregon. *Id.* at 12:15-16. Blake Kilburn and his new wife then moved to Seattle to be near Peter and soon welcomed their first child, Steven Timothy Kilburn ("Tim"), into the world. *Id.* at 12:16-25. Peter Kilburn took his role as an uncle seriously. When Blake had to leave his family to work temporarily in Alaska, Peter acted as a surrogate father to Tim Kilburn, attending his nephew's birth and standing by the little boy when he had an operation. *Id.* at 12:22-13:2.

10. Peter Kilburn graduated from the University of Washington *summa cum laude* and as a member of the Phi Beta Kappa honors society, receiving a degree in anthropology. *Id.* at 13:3-6. Upon graduation, Peter Kilburn obtained a masters degree in librarianship from the University of California, Berkeley, graduating, again, with honors. *Id.* at 13:7-17.

11. Peter Kilburn remained a bachelor during his life and never had any children of his own. However, Peter's role as an uncle to Blake's seven children was very important to him. *Id*. at 13:25-14:14. Peter was particularly proud of his nieces and nephews and thought of them as a surrogate family for the one that he did not have. *Id.* at 14:8-14.

12. Upon graduating from Berkeley, Peter Kilburn took a job managing the U.S. Air Force's library system in Spain, where he worked for several years and received commendations for his performance. *Id.* at 14:18-23, 15:9-13. Peter then traveled to North Africa, working in the library system of another U.S. military installation. *Id.* at 14:23-15:4.

13. In the late 1950's or early 1960's, Peter accepted a position in the library at AUB, working in the acquisitions department. *Id.* at 16:3-20. Peter's main responsibility for AUB was traveling to other countries to purchase books for the University's collection. *Id.* at 16:17-24.

Peter was a very popular and well respected man at AUB. *Id.* at 17:18-23. During a surprise

visit to Beirut, Blake saw that Peter was a "moving force" at AUB and that he had many friends

at the school. *Id.* at 17:3-23. This sentiment was echoed by a coworker, who wrote a profile of

Peter after his death in a journal on Middle East affairs, stating that Peter was "a man of well-

considered convictions and with a sense of values" who had a "massive job" as the University's

Acquisition Librarian. *See* Pls.' Proposed Facts, Ex. 2, ARTHUR H. WHITMAN, PERSONALITY:

PETER KILBURN, WASHINGTON REPORT ON MIDDLE EAST AFFAIRS 10 (1986) ("PERSONALITY").

14.     Peter had a "very happy life" at AUB. Kilburn Dep. at 17:24-25. According to

Blake, Peter had a nice apartment and a pet cat and Blake was "very impressed with his set up

[,]" believing Peter to be "very happy and certainly in control of his life." *Id.* at 18:2-5. During

his time abroad, Peter and Blake Kilburn maintained contact routinely through correspondence.

*Id.* at 18:21-24.

15.     Peter occasionally visited the United States while on work trips, and each visit

was "a very fine thing for the family" according to Blake Kilburn. *Id* at 18:6-17. On one

particular trip, Peter visited his mother in Berkeley, and Blake was "lucky" enough to be able to

join them. *Id.* at 18:8-12. Peter Kilburn also visited the family right before his kidnapping,

around August 1984. *Id.* at 23:9-20. During that visit, Blake Kilburn tried to dissuade Peter

from returning to Beirut because of the turbulent climate in Lebanon. *Id.* at 23:21-24:8. Peter

was not persuaded, informing Blake that he wanted to return to Lebanon. *Id.* at 24:7-8; 26:2-23.

16.     In fact, in the years leading up to his abduction, Peter never expressed any

concerns for his safety to Blake, despite the rapidly deteriorating security situation in Lebanon.

*Id.* at 19:7-13. According to Blake, Peter was not a "fearful sort of person" and Peter felt that his

ability to speak fluent Arabic and his integration into Lebanese society protected him. *Id.* at

19:16-21. Though Peter did discuss the January 1984 assassination of AUB president Malcolm

Kerr with Blake Kilburn, he was not the type of person to convey his pain over Kerr's death.  *Id.* at 24:25-25:1-5.  Ultimately, Peter believed that AUB's educational program and its 120 years of service were worth the security risks he faced daily.  *See* PERSONALITY.

17.     Peter Kilburn experienced health problems in the years before his abduction.  In the late 1970's or early 1980's, Peter suffered a stroke that led to some paralysis and required him to walk with a cane.  Kilburn Dep. at 20:15-24.  Peter's intellect and speech, however, remained fully functional.  *Id.* at 20:23-25.  Additionally, Peter suffered from heart disease, hypertension, and other ailments requiring medications and medical attention.  Peter's colleague described him as "increasingly frail physically," but pointed out that Peter "remained strong in his convictions and forceful in his daily battle for truth and knowledge [,]" which Peter believed to be the most powerful tools for peace.  *See* PERSONALITY.

18.     On or about November 30, 1984, Peter Kilburn was abducted from his Beirut apartment (some reports state the kidnapping occurred on various dates in early December 1984).  Declassified U.S. State Department *contemporaneous* documents suggest that Peter could have been kidnapped by "hired guns" working for Hizbollah.  *See* Pls.' Proposed Facts, Ex. 3, Department of State Telegraph, ("Telegraph") at ¶¶ 3-4 (Dec. 1986).  However, Ambassador Robert Oakley, who served as the Coordinator for Counterterrorism at the State Department from 1984 to 1988, averred that, based on first hand knowledge that includes classified sources, as well as the benefit of learning more over time, there was extensive evidence establishing that Peter Kilburn was kidnapped by agents of Iran working in Lebanon.  *See* Pls.' Proposed Facts, Ex. 4, Declaration of Ambassador Robert B. Oakley ("Oakley Decl.") at ¶ 6.

19.     Oakley explained further that declassified U.S. Government documents indicated that "Islamic Jihad," which is simply another name for the terrorist organization Hizbollah, had accepted responsibility for Kilburn's kidnapping and detention.  *Id.* at ¶¶ 7-8, Exhibit D, U.S.

Dep't of State, PATTERNS OF GLOBAL TERRORISM: 1984 28 (Nov. 1985); *see also* Pls.' Proposed

Facts, Ex. 5, U.S. Gov't Declassified Doc., *International Links of LARF* at 3, 5 (Feb. 1985).

Ambassador Oakley based this assessment partly on an unclassified CIA "Action Message"

stating that an anonymous caller to Beirut news agencies claimed Islamic Jihad's responsibility

for the abduction of CIA agent William Buckley, CNN newsman Jeremy Levin, Reverend

Benjamin Weir, Peter Kilburn, and Father Lawrence Jenco, who were to be tried as CIA spies.

*See* Oakley Decl., Exhibit A, *Demarche Regarding Reported Islamic Jihad Plans to Put U.S.*

*Citizens on Trial* at 1; *see also* Pls.' Proposed Facts, Ex. 6, U.S. Gov't Declassified Doc., *Talking*

*Points for the DCI/DDCI Meeting with Senator David Durenberger* at ¶ 2 (Jan. 11, 1985)

(stating that the Iranian-backed Islamic Jihad was assumed to be responsible for Kilburn's

kidnapping). Additional declassified U.S. State Department documents indicate further that

Islamic Jihad was simply a cover name for Hizbollah. Telegraph at 3; Pls.' Proposed Facts, Ex.

7, U.S. Gov't Declassified Doc., *Islamic Jihad Claims Responsibility for Buckley Kidnapping* at

¶ 4 (Apr. 4, 1984).

20. According to Dr. Patrick Clawson, Deputy Director of the Washington Institute

for Near East Policy and a long-time analyst of the Iranian government who has testified in

several cases before this court and regularly been deemed an expert on Iran by the judges of this

court, "Islamic Jihad," is a known alias of Hizbollah. According to Clawson, although Islamic

Jihad accepted credit for Peter's kidnapping, the fact that the terrorists were able to succeed in

keeping Kilburn and others hidden from Western governments seeking to locate the hostages, is

one indication that Hizbollah, with the funding and assistance of Iran and MOIS, were in reality

the ones behind the hostage taking. *See* Pls.' Proposed Facts, Ex. 8, Dep. of Dr. Patrick

Clawson, ("Clawson Dep.") at 32:19-33:6; *see also Anderson v. The Islamic Republic of Iran*, 90

F. Supp. 2d 107, 112 (D.D.C. 2000) (relying on Clawson's testimony); *Sutherland v. Islamic*

*Republic of Iran*, 151 F. Supp. 2d 27, 46 (D.D.C. 2001) (same). Dr. Clawson also testified that it is not apparent Islamic Jihad ever actually existed. Clawson Dep. at 30:3-5. Rather, all relevant evidence suggests that Islamic Jihad was a name used by Hizbollah members as an alias in the organization's early days to conduct terrorist operations without fear of political reappraisals. *Id.* at 30:5-31:2.

21. Thus, all activities carried out in the name of Islamic Jihad, were, in fact, carried out by Hizbollah. Clawson Dep. at 31:8-12; *see also* Pls.' Proposed Facts, Ex. 9, U.S. Dep't of State, *Iran's Use of International Terrorism* at 1 (Oct. 27, 1987) (stating that Hizbollah operates under the name Islamic Jihad); Pls.' Proposed Facts, Ex. 10, CIA, Directorate of Intelligence, *Lebanon: The Hizb Allah* at 3 (Sept. 27, 1984) (stating that Hizbollah, using the cover of Islamic Jihad was responsible for the 1984 U.S. Embassy Annex Bombing). Indeed one declassified CIA document states that this was exactly the case with Peter Kilburn, explaining that while Islamic Jihad claimed responsibility for the kidnapping, Peter was likely being held by Hizbollah. *See* Pls.' Proposed Facts, Ex. 11, CIA, Directorate of Intelligence, *Terrorism Review* at 7 (Apr. 8, 1985).

22. Unfortunately Peter Kilburn's death and the fact that he was never held with another hostage who survived this ordeal prohibits the court from knowing the exact conditions of his captivity. Yet the fact is that every American and Western hostage held by Hizbollah endured, as Dr. Clawson put it, "extraordinarily unpleasant conditions." Clawson Dep. at 37:1-2. All American captives were kept in solitary confinement, shackled to walls, given inadequate food, subjected to beatings and mock executions, placed in unsanitary conditions and most, if not all, captives were held underground for most of their confinement. *Id.* at 37:2-12. Moreover, severe medical problems, such as those suffered by Peter Kilburn, were left untreated or were treated inadequately. *Id.* at 37:10-15. Importantly, many of these captives actually saw their

captors wearing Iranian military uniforms or heard people speaking in Persian. *Id.* at 37:6-10.

Dr. Clawson had no reason to believe that the circumstances of Peter Kilburn's captivity were different from those these other hostages. *Id.* at 38:3-14. Indeed, the same group that claimed responsibility for Peter Kilburn's kidnapping also claimed to have abducted William Buckley, Benjamin Weir, and Lawrence Jenco, whose circumstances as hostages are well documented by this court and formed the basis for Dr. Clawson's assessment of the prisoners' conditions of confinement. *See* Oakley Decl., Exhibit A at 1; *see also Anderson,* 90 F. Supp. 2d at 109-10 (describing conditions of confinement); *Sutherland,* 151 F. Supp. 2d at 33-36 (same); *Surette v. Islamic Republic of Iran,* 231 F. Supp. 2d 260, 263-65 (D.D.C. 2002) (same).

23. Throughout the sixteen months of Peter's captivity, his family received no information regarding his whereabouts or his condition. Kilburn Dep. at 18:21-24. Some time after Peter's murder, the FBI gave Blake a short, hand-scribbled note, reportedly from Peter that the FBI had intercepted during his captivity. *Id.* Prior to his abduction, Peter regularly corresponded with friends and family. *Id.* However, the letter intercepted by the FBI was the only correspondence received from Peter Kilburn after he was abducted. *Id.* at 28:15. According to Blake Kilburn, the letter did not read like something his brother would write. *Id.* The lack of contact or information regarding Peter's whereabouts and condition caused Blake Kilburn and his family severe mental anguish, depression, and anxiety. *Id.*

24. According to Ambassador Oakley, the U.S. Government received very little information concerning Peter Kilburn's whereabouts through much of 1985. Oakley Decl. at ¶ 9, Exhibit E, United States Department of State, *Patterns of Global Terrorism: 1985* at 18 (Oct. 1986) (stating that at the end of 1985, Peter Kilburn was still being held by a Hizbollah faction). Further, Dr. Clawson testified that the U.S. Government engaged in extensive efforts to locate and rescue Peter Kilburn. Clawson Dep. at 34:8-35:4, 35:21-36:7. In late 1985, the U.S.

Government was approached by a foreign intermediary who provided "convincing evidence of contact" with Peter's captors. Oakley Decl. at ¶ 9. The U.S. Government then entered into negotiations with the captors through the intermediary to secure Peter's release. *Id.* Simultaneously, the U.S. Government undertook covert activity with the FBI, Canadian Royal Mounted Police, and the CIA to obtain Peter's release. *Id.*; *see also* Pls.' Proposed Facts, Ex. 12, U.S. Gov't Declassified Doc., *U.S./Iranian Contacts and the American Hostages* ("*U.S./Iranian Contacts*")at 7 (Nov. 17, 1986). Ambassador Oakley, as the State Department's Coordinator for Counterterrorism, was directly involved in these efforts. Oakley Decl. at ¶ 9. Declassified U.S. Government documents support Oakley's statements that the United States was in ongoing negotiations with Iranian intermediaries to free hostages in Lebanon. *See U.S./Iranian Contacts* at 1-9.

25. In the spring of 1986, Blake Kilburn's family was informed by Colonel Oliver North that the United States was close to reaching an agreement with Peter's captors for his release. Kilburn Dep. at 30:20-31:13. Colonel North had orchestrated an elaborate plan to ransom Peter Kilburn with specially-treated United States currency, purportedly supplied by H. Ross Perot, that would disintegrate within hours of Peter's release. *Id.* Colonel North's plan, however, was never carried out because the United States bombed Tripoli, Libya on April 14, 1986. *Id.* at 32:2-12.

26. After the bombing of Tripoli, Libyan agents in Lebanon made it known that they wanted to purchase an American hostage to murder in retaliation for the bombing. *Id.* Declassified U.S. intelligence documents reveal that Libyan agents purchased Peter Kilburn and two British hostages, Leigh Douglas and Philip Padfield, from Hizbollah for approximately $3,000,000 sometime between April 14 and 17. Oakley Decl. at ¶¶ 11-12. On April 17, 1986, the ARC shot Peter in the back of the head and left his body and those of the two British

hostages on the side of a road outside of Beirut. *Id.* The ARC claimed responsibility for Peter

Kilburn's murder. *See* Oakley Decl., Exhibit F, U.S. Dep't of State, *Patterns of Global*

*Terrorism: 1986* at 35 (Jan. 1988). Ambassador Oakley's declaration confirms that Libyan

agents purchased Peter Kilburn so that they could murder him in retaliation for the U.S. air

strikes on Libya. Oakley Decl. at ¶¶ 6, 11-12. Apparently, the murder of Peter Kilburn

prompted the Iranians to renew covert diplomatic contacts with the United States as a means of

avoiding accusations that they were culpable for Peter's death – even though they had sold

Kilburn no doubt aware of his likely fate. *U.S./Iranian Contacts* at 7. Nevertheless, Peter

Kilburn was dead at age 61. Kilburn Dep. At 32:10-12.

27. Peter Kilburn was buried with full military honors at the Presidio military base in

San Francisco, California. *Id.* at 35:4-25. Reverend Benjamin Weir, a longtime friend of Peter's

and himself a former hostage in Lebanon, spoke at Peter's funeral. *Id.* at 36:17-37:4. Peter's

grave overlooks the Golden Gate Bridge, which Blake Kilburn described as the ideal resting

place for his brother, who loved dearly the Bay area. *Id.* at 35:12-17.

## 2. Blake Kilburn

28. Blake and Peter Kilburn shared a close fraternal bond that, despite the

geographical distance, was growing even closer in the immediate period before Peter's untimely

death. Blake, now deceased, suffered mightily after hearing that his brother had been taken from

him in such a "needless" manner. *Id.* at 33:24.

29. Growing up, Blake Kilburn and his brother did not have many things in common.

Kilburn Dep. at 7:17-25. While Peter was studious, Blake was a "cutup" and enjoyed playing

with animals and tinkering with radios. *Id.* at 11:21-24. Nevertheless, Blake had "a great deal of

affection and respect for" his older brother and Blake was certain that those feelings were

reciprocated. *Id.* at 11:24-25.

30.     During World War II, Blake became a radio officer aboard an ammunition ship. *Id.* at 11:13-16.  Blake constantly tried to identify Peter's location during the war, believing that his more mobile position aboard a ship might allow him to reunite with his brother.  *Id.* Nevertheless, Blake and Peter were unable to reconnect during the war.  *Id.*

31.     After the war, Blake worked off and on, trying to find himself before eventually settling down and marrying.  *Id.* at 12:7-14.  As noted, Blake selected Peter to be his best man at his wedding and Peter traveled from Seattle to Portland for the occasion.  *Id.* at 12:14-16. Following the wedding, Blake and his first wife traveled to Seattle, to join Peter.  *Id.* at 12:16-18. Moreover, Peter served as a surrogate father for Blake's burgeoning family while Blake traveled for work.  *Id.* at 12:22-13:2.  Ultimately, Blake had seven children, one of which subsequently passed away.  *Id.* at 13:24-25.  Most of Blake's children, as well as Blake himself, were very close with Peter.  *Id.* at 14:8-14.

32.     After Peter's move to Lebanon, Blake and he stayed in touch through regular correspondence.  *Id.* at 17:3, 18:21-24.  During his deposition, Blake described with fondness surprising Peter with an impromptu visit to Beirut.  *Id.* at 17:3-10.  The two brothers traveled all over Lebanon, with Peter acting as the informative tour guide, for which Blake was particularly thankful.  *Id.* at 17:8-17.

33.     During Peter's last visit, Blake tried to persuade him not to return to Lebanon because Blake did not have the "confidence in [Peter] being untouchable that perhaps he had." *Id.* at 26:19-23.  Blake was concerned because Peter was his "only brother" (in fact his only sibling) but Peter was "immovable" on the subject.  *Id.*  From that final visit, Blake further recalled:

> that he was older.  And we were closer.  As far as a common bond between us seemed to be − a little bit more prevalent because all during our lives he was interested in a lot of things that I wasn't,

and I was interested in a lot of things that he wasn't. And as we grew older we became closer, and I became more interested in things that he was interested in, and he was more interested in things that I was interested in. So, I really wanted to spend time with him. And on a long-term basis; not just, you know, days or hours. . . We didn't get the time that I'm sure either one of us wanted.

*Id.* at 27:1-14.

34.     Blake Kilburn was working in Tahiti when one of his children called him to inform him that his brother Peter had been kidnapped. *Id.* at 28:3-7. Blake was shocked, but believed that his brother would soon be released after U.S. Government intervention. *Id.* at 28:10-15. Blake described that initial period as a "pretty worrisome time." *Id.* at 28:15.

35.     While Blake continued his employment in Tahiti, his family worked tirelessly with the U.S. Government to obtain Peter's release. *Id.* at 28:19-29:1. Kilburn family members flew to Washington, D.C. to meet with President Reagan, Vice President Bush, Deputy National Security Advisor Poindexter, and others. *Id.* The family members, however, came away from each meeting discouraged. *Id.* They perceived a lack of interest in Peter's predicament on the part of Reagan administration officials. *Id.* at 28:24-30:13. Despite intense efforts by the Kilburn family, they did not feel that their pleas had an impact upon the administration. *Id.* at 29:25-30:13

36.     At some point during Peter's captivity, the Kilburn family was informed that H. Ross Perot and Lieutenant Colonel Oliver North had devised a plan to obtain Peter's release. *Id.* at 30:14-31:13. Perot had put up the $500,000 that Peter's captors had requested initially for his release, before changing their demands to $1,000,000, which Perot also agreed to provide. *Id.* at 30:20-31:2. While Oliver North and other U.S. officials considered how best to handle the money, however, Peter was killed. *Id.* at 31:3-13.

37.     Blake Kilburn was in Tahiti when a coworker told him that the BBC had reported that Peter Kilburn had been shot dead and left on the streets of Beirut. *Id.* at 32:15-21. Blake felt "despair" and "a great deal of anger." *Id.* at 33:10-13. Further, Blake felt frustration that he could not prevent Peter from being killed. *Id.* Notably, during Blake Kilburn's deposition, held over 15 years after Peter's murder, he became overwhelmed when speaking about his brother's death and needed to take a break to collect himself. *Id.* at 33:12-15.

38.     Blake described harboring "a very strong anger" about Peter's killing because it was "very pointless." *Id.* 33:22-25. Blake had difficulty conceiving "how someone could just buy and sell another person and then shoot them in the head and dump them in the street." *Id.* at 33:25-34:3. During his deposition, Blake could not think of the words to describe his anger, frustration, and sadness, but did explain that he had wished for revenge, despite how impractical it would be to achieve. *Id.* at 34:5-12. Ultimately, Blake was left only to grieve, "because you can't really do a darn thing." *Id.* at 34:12-14.

39.     Finally, Blake described the pain of losing his only sibling. Blake was sorry that his children and grandchildren were deprived of their uncle. *Id.* at 37:21-38:1. The most profound impact on Blake was that, in the back of his mind, he thought that Peter would come home and that the two brothers could make up some of the time they had lost living in diverse parts of the world during their respective adulthoods. *Id.* at 38:1-9.

40.     Blake Kilburn participated in this case, until his death in January 2006, because he felt that Peter's captors and murderers "should not go unpunished." *Id.* at 38:21. This court subsequently substituted Blake Kilburn's personal representatives, Angelita B. Kilburn and Tim Kilburn to act as co-plaintiffs on behalf of the estates of Peter C. Kilburn and Blake Kilburn. *See* Minute Order (Sept. 21, 2006).

### 3. Hizbollah, Iran, and MOIS

41.     Hizbollah, meaning "Party of God," was founded in the early 1980's at the direction of Iranian government officials looking to radicalize existing Shia Muslim organizations, and thus obtain more control over the Shia community in southern Lebanon. *See* Clawson Dep. at 11:17-13:13. Hizbollah has been the principal organization in the Lebanese Shia community for over 20 years and engages in a variety of activities both charitable and military in nature, including the use of terrorism. *Id.* at 12:17-13:13. After the Israeli invasion of Lebanon in 1982, the "Iranian government set itself to the organization of [Hizbollah] as a more radical group" and one that it could more directly control. *Id.* at 15:2-6. Further, the Iranian Revolutionary Guard ("IRG") began to play a direct role in the organization of Hizbollah around 1983, even sharing a headquarters with the organization at one point. *Id.* at 15:9-18; *Iran's Use of International Terrorism* at 1. In time, Hizbollah became the preferred surrogate for Iranian terrorist activities. *Id.* Ambassador Oakley's declaration supports this proposition, stating that there was a direct connection between the Government of Iran and Hizbollah. Oakley Decl. at ¶ 8.

42.     Ambassador Oakley noted that U.S. intelligence documented Iran's significant financial and material support for Hizbollah's terrorist activities throughout the 1980's. Oakley Decl. at ¶ 15. The United States Department of State publication, *Patterns of Global Terrorism: 1986*, a well respected intelligence assessment produced yearly, confirms that Iran provided support to Hizbollah in kidnapping foreigners and conducting terrorist operations against Western interests. Oakley Decl., Exhibit F, *Patterns of Global Terrorism: 1986* (Jan. 1988) at 10; *see also* Clawson Dep. at 51:2-53:6 (testifying that the *Patterns of Global Terrorism* reports are "the gold standard of what the U.S. Government has to say about the various terrorist episodes" and generally describing them as very accurate). Further, Iran had substantial

influence over the group's activities and provided financial assistance as well as weapons and training to Hizbollah. *Id.* Additionally, "[o]ne of Tehran's goals in Lebanon [was] to make [Hizbollah] a unified movement under overall Lebanon direction; in support of this, several hundred [IRG] members provide[d] military training and logistic support to Hizbollah." *Id.* at 22. The State Department report also explains that the IRG supported, directed, and, at times, controlled Hizbollah and assisted in several Hizbollah kidnappings of Westerners. *Id.*

43.     Dr. Clawson testified that Hizbollah received extensive funding from Iran. In the early 1980's Hizbollah received somewhere around $50,000,000 in aid from Iran. Clawson Dep. at 42:10-19. By 1986, the figure escalated and Iran was likely providing Hizbollah upwards of $100,000,000 in funding. *Id.*

44.     Sometime after the Israeli invasion, Iran became very concerned by the presence of American, French, and Italian peacekeeping forces in Lebanon, so it took an active role in organizing the bombing of the American Embassy in Beirut, amongst other Western embassies and military installations, with the hopes of pushing those countries out of Lebanon. Clawson Dep. at 16:5-20. According to Dr. Clawson, Iran funded and sponsored these bombings. *Id.* at 21:4-11. Iran's motives for such terrorist acts were both to drive Western influence from Lebanon and to create a copy of the Iranian Islamic Republic in Lebanon. *Iran's Use of International Terrorism* at 1; *see also* Oakley Decl., Exhibit D, *Patterns of Global Terrorism: 1984* (Nov. 1985) at 4 (stating that Iran intended to drive U.S. influence from the Islamic world through the sponsorship of Hizbollah).

45.     In early 1984, Hizbollah's tactics shifted from bombings to assassinations and kidnappings. Clawson Dep. at 21:12-22:5. Such terrorist acts included the kidnapping of AUB President, David Dodge − who was actually transported by Hizbollah to Iran − and the assassination of his successor, Malcolm Kerr. *Id.* at 18:19-19:1, 22:6-19. Dr. Clawson testified

that AUB and its Western faculty and staff became an important target for Hizbollah because it: (1) was the premier educational institution in the Middle East; (2) was closely associated with the United States; (3) was founded by American Christian missionaries; (4) received a great deal of its funding from the U.S. Government; and (5) its faculty and staff were disproportionately American. *Id.* at 23:12-19. For these reasons Hizbollah, at the direction of Iran, began kidnapping and killing AUB faculty and staff. *Id.* at 25:9-26:9, 28:2-29:12. *See also, Kerr v. Islamic Republic of Iran,* 245 F. Supp. 2d 59, 61-62 n. 5, 6 (D.D.C. 2003) (describing chronology of Hizbollah sponsored terrorist events in Lebanon).

46. Fundamental to the success of Hizbollah's kidnapping campaign was Iranian money and expertise in the tactic. Clawson Dep. at 28:21-29:12. As Dr. Clawson said,

> [T]here were a fair number of intelligence services who were hunting for [the hostages]. And Lebanon is a small country and it took remarkable skill to conceal these individuals and that was quite a professional accomplishment and was something well beyond the capacity of [Hizbollah] to have done on their own and required the considerable hands-on assistance from one of the most experienced . . . and respected spy agencies in the Middle East, namely the Iranian spy agency which the revolution inherited from the Shah.

*Id.* at 29:1-12. U.S. Government documents indicate that Hizbollah was responsible for "almost all of the kidnappings of westerners in Lebanon" and that Iran exercised "strong influence over all hostage-related decisions." *Iran's Use of International Terrorism* at 2.

47. Much of Hizbollah's expertise in handling hostages came from MOIS. MOIS was founded in 1984 and is the "rebaptised" spy agency SAVAK, which was the Shah's internal and external spy organization before the Iranian revolution in 1979. Clawson Dep. at 46:15-48:5. MOIS is an official government organization of Iran that, during the 1980's, employed approximately 10,000 to 15,000 people. *Id.* at 48:6-49:1. Moreover, MOIS, from its previous days under the Shah as SAVAK, had developed a particular expertise in taking and holding

hostages and operating secret prisons for hostages. *Id.* at 47:18-48:5, 49:2-6. Dr. Clawson testified that this expertise was shared with Hizbollah for purposes of taking and holding hostages during the 1980's. *Id.* at 49:7-10. More importantly, Dr. Clawson testified that, based on the unsuccessful efforts of Western intelligence agencies in locating Peter Kilburn, this expertise was utilized by Hizbollah in taking and keeping Peter Kilburn hostage. *Id.* at 49:13-18. In fact, Dr. Clawson testified that Hizbollah was incapable of holding Peter Kilburn hostage for a year and half without the assistance of Iran. *Id.* at 49:19-50:15.

48. Ultimately, Dr. Clawson testified that "[t]here is no doubt in [his] mind" that Hizbollah kidnapped and held Peter Kilburn hostage with the funding and support of Iran. *Id.* at 53:7-54:3.

## B. Procedural Background

49. The plaintiffs filed this suit against both the Iranian defendants and the Libyan defendants on June 12, 2001. *See generally* Compl. Following service of the summons and complaint on all defendants, the Libyan Defendants filed a motion to dismiss. On August 8, 2003, the court denied that motion. *See generally* Mem. Op. (Aug. 8, 2003). The Circuit affirmed that decision. *Kilburn v. Socialist Peoples' Libyan Arab Jamahiriya,* 376 F.3d 1123 (D.C. Cir. 2004). Following remand, discovery ensued.

50. By contrast, the Iranian defendants chose not to participate in this case. As a result, the Clerk of Court entered default as to Iran and MOIS on March 2, 2005. *See* Entry of Default (Mar. 2, 2005).

51. In January 2006, Blake Kilburn died. *See* Suggestion of Death (Mar. 16, 2006). The plaintiffs timely filed a Suggestion of Death, *id.*, and sought to substitute Angelita Kilburn (Blake's wife) and Steven Timothy Kilburn (Blake's eldest son) as party plaintiffs and co-

representatives of the estates of Peter and Blake Kilburn, *see* Pls.' Mot. to Substitute Party. The court granted that motion in court on September 21, 2006. *See* Mem. Op. (Sept. 21, 2006)

52.     Meanwhile, on May 12, 2006, President Bush rescinded Libya's designation as a state sponsor of terrorism, a designation it had held since the list was created in 1979. *See* 71 Fed. Reg. 31909 (May 12, 2006). As a result, the Libyan defendants again moved to dismiss, arguing that Libya's removal from the terrorism list deprived the court of jurisdiction. *See generally* Libyan Defs.' 2d Mot. to Dismiss. The court rejected that argument and denied the motion to dismiss on July 26, 2006. Mem. Op. (July 26, 2006). The Circuit summarily affirmed that decision. *Kilburn v. Islamic Republic of Iran*, No. 06-7127 (D.C. Cir. Oct. 19, 2006).

53.     In 2008, the United States and Libya negotiated a resolution of all civil victims of terrorism cases that resulted in the enactment of the Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008). In order to collect settlement funds under the Act, the plaintiffs sought in late 2008 to dismiss their claims against the Libyan Defendants. The court granted that motion on February 26, 2009. Mem. Op. (Feb. 26, 2009).

54.     On March 9, 2009, the court permitted the plaintiffs to amend their complaint to reflect a new cause of action created by amendments to the terrorism exception to the FSIA. Mem. Order (Mar. 9, 2009). On June 25, 2009, the court ordered the plaintiffs to file all necessary papers to support a judgment of default against the Iranian defendants. Minute Order (June 25, 2009). On July 31, 2009, the plaintiffs filed a Motion for Default Judgment, Proposed Findings of Fact and Conclusions of Law, and various exhibits. *See* Pls.' Mot. for Default J.; Pls.' Proposed Facts.

# III.  CONCLUSIONS OF LAW

## A.  Service of Process and Default

Service of process on Iran and its political subdivision, MOIS, is governed by 28 U.S.C. § 1608(a).[1]  The first approach towards service that a plaintiff litigating against Iran must undertake is sending a copy of the summons, complaint, and a notice of suit, together with a translation of each into the official language of Iran, Farsi, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs for Iran.  28 U.S.C. § 1608(a)(3).  In accordance with this provision, and for each defendant, the Clerk of the Court sent a copy of the required documents to the Iranian Ministry of Foreign Affairs via registered mail on August 31, 2001.  *See* Pls.' Request (Aug. 22, 2001); Clerk's Aff. (Aug. 31, 2001).  The documents sent to Iran were returned unexecuted.  *See* Return of Service (Dec. 4, 2001).

Having attempted service against the Iranian defendants through § 1608(a)(3), Plaintiff resorted to the procedures described in § 1608(a)(4), which provide for service "through diplomatic channels to the foreign state."  On October 9, 2001, Plaintiff requested that the Clerk of the Court send copies of the necessary documents to MOIS pursuant to § 1608(a)(4).  *See* Pls.' Request (Oct. 9, 2001).  On February 8, 2002, the Clerk of the Court filed a return of service affidavit stating that service had been executed upon both Iran and MOIS via diplomatic channels.  *See* Return of Service (Feb. 8, 2002).  Plaintiff then moved this court for default on

---

[1]      Other courts have established that the Ministry of Information and Security ("MOIS") is a political subdivision of the Islamic Republic of Iran ("Iran") and not an agency or instrumentality.  *See Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 59 (D.D.C. 2007) (citing *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 274-75 (D.D.C. 2005)).  Thus, service of process upon MOIS is effected in the same manner as service upon Iran itself.  *See Nikbin*, 471 F. Supp. 2d at 59; 28 U.S.C. § 1608(a)(3), (4).

March 27, 2002, and again on March 1, 2005, because Iran and MOIS had not yet responded to the complaint or summons within 60 days, or at all. *See* Pls.' 1st Mot. for Default; Pls.' 2d Mot. for Default. The Clerk of the Court entered default on March 1, 2005. *See* Clerk's Entry of Default (Mar. 2, 2005). On June 25, 2009, the court ordered that the plaintiffs "submit the necessary motion and supporting documentation to obtain a judgment against" Iran and MOIS pursuant to Federal Rule of Civil Procedure 55(b). *See* Minute Order (June 25, 2009). The plaintiffs have now done so.

## B. Burden of Proof.

Under the FSIA, this court may enter a default judgment against Iran if the plaintiffs "establish[] [their] claim or right to relief by evidence satisfactory to the court." *See* 28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003).

To prevail in an FSIA default proceeding, the plaintiffs must present a legally sufficient *prima facie* case, in other words, "a legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008) (quotation omitted). This standard is identical to that applicable to default judgments against the United States. *See Wachsman*, 603 F. Supp. 2d at 144, n. 3; Fed. R. Civ. P. 55(e). Section 1608(e) does not require this court to demand additional or different evidence than it would ordinarily receive in rendering its decision. *Gates*, 580 F. Supp. 2d at 63 (citation omitted). In assessing the plaintiffs' evidence, this court may "accept as true the plaintiff's uncontroverted evidence." *Elahi v. The Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000). Further, a plaintiff may establish proof by affidavit. *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003).

## C. Jurisdiction Under the FSIA

The FSIA provides the sole basis for obtaining jurisdiction over Iran and MOIS.  *See*

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  Thus, to

establish that this court has jurisdiction over Iran and MOIS, the plaintiffs must demonstrate that

one of the FSIA's enumerated exceptions to Iran's sovereign immunity applies.  *Kilburn*, 376

F.3d at 1126.  Importantly, the court has previously established that Libya and the Libyan

External Security Organization ("LESO") were not immune from jurisdiction under 28 U.S.C.

§ 1605(a)(7), because Libya was a state sponsor of terrorism.  *See* Mem. Op. (Aug. 8, 2003),

*abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C.

Cir. 2004).  That decision was affirmed on appeal.  *See Kilburn*, 376 F.3d at 1127-36.

On January 28, 2008, the FSIA was amended when the President signed into law the

National Defense Authorization Act for Fiscal Year 2008 ("NDAA").  Section 1083 of the

NDAA sets forth a new provision amending § 1605(a)(7), 28 U.S.C. 1605A(a)(1), which states:

> A foreign state shall not be immune from the jurisdiction of
> U.S. courts in cases where plaintiffs seek money damages
> for personal injury or death caused by hostage taking,
> torture, or extrajudicial killing, if the damages were caused
> by an act of torture, extrajudicial killing, aircraft sabotage,
> hostage taking, or the provision of material support or
> resources for such an act if such act or provision of material
> support or resources is engaged in by an official, employee,
> or agent of such foreign state while acting within the scope
> of his office, employment, or agency.

Additionally, the foreign state defendant must be designated a state sponsor of terrorism when

the original action was filed under 28 U.S.C. § 1605(a)(7).  28 U.S.C. § 1605A(a)(2)(A)(i)(II).

Finally, the claimant or victim must be, *inter alia*, a national of the United States.  28 U.S.C.

§ 1605A(a)(2)(A)(ii)(I).  Previously, this court allowed the plaintiffs to proceed against Iran

using these new statutory provisions of § 1605A.  *See* Mem. Order (March 9, 2009); Pls.' 1st

Am. Compl.

Additionally, the NDAA amended the FSIA to incorporate a private right of action to

recover damages for state-sponsored terrorism:

> A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to−
>
> (1) a national of the United States . . .
>
> (4) the legal representative of a person described in paragraph (1) . . .
>
> for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages.  In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages.  In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. § 1605A(c).  Notably, in the plaintiffs' first amended complaint, they specifically

invoked the NDAA's new private right of action.  *See* Pls.' 1st Compl.  Examining both the

sovereign immunity and the private right of action provisions of the amended FSIA, it is clear

that they share many similar elements, by virtue of § 1605A(c)'s reliance on the fulfillment of

§ 1605A(a)(1).  *Compare* 28 U.S.C. § 1605A(a)(1), *with id*. §1605A(c).  Sovereign immunity

and liability are, however, two separate issues, so the court will examine them in turn.  *See*

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) (stating that

sovereign immunity typically protects a foreign nation not just from liability, but from the

burdens of litigation and trial); *Sutherland*, 151 F. Supp. 2d at 47 ("It should be stressed . . . that

the liability determination is *separate and distinct* from the immunity determination") (emphasis

in original).

## 1. Subject Matter Jurisdiction

The court has subject matter jurisdiction over Iran and MOIS pursuant to 28 U.S.C.

§ 1605A(a)(1) and (2). The plaintiffs have produced *prima facie* evidence proving that they are

entitled to money damages against Iran for personal injury and death caused by Iran's provision

of material support for Hizbollah's hostage taking, torture, and the ultimate extrajudicial killing

of Peter Kilburn. *See* 28 U.S.C. 1605A(a)(1); *see also*, *Kilburn*, 376 F.3d at 1125 (stating that

Hizbollah, which was funded by Iran, took Kilburn hostage and sold him to the ARC for

$3,000,000 whereupon he was tortured and killed).

## 2. Hostage Taking, Torture, and Extrajudicial Killing

The factual record establishes clearly that Hizbollah, with direction, funding, and

guidance from Iran and MOIS, subjected Peter Kilburn to "hostage taking" as defined in Article

1 of the International Convention Against the Taking of Hostages. *See generally* Clawson Dep.

It is "patently undeniable" that Peter Kilburn was held hostage by Hizbollah for approximately

15 months. *See Sutherland*, 151 F. Supp. 2d at 45 (finding that plaintiff, taken hostage under

similar circumstances to the instant case, was held hostage within the meaning of the FSIA);

Pls.' Proposed Facts ¶¶ 19, 23-27. Indeed, Islamic Jihad, an alias of Hizbollah, publicly

proclaimed that it had taken Kilburn hostage. *See* Pls.' Proposed Facts ¶¶ 19-22.

Further, Kilburn experienced "torture" as defined in section 3 of the Torture Victims

Protection Act of 1991 ("TVPA") (28 U.S.C. § 1350 note). The TVPA defines torture as:

> any act, directed against an individual in the offender's custody or
> physical control, by which severe pain or suffering (other than pain or
> suffering arising only from or inherent in, or incidental to, lawful
> sanctions), whether physical or mental, is intentionally inflicted on that
> individual for such purposes as obtaining from that individual or a third
> person information or a confession, punishing that individual for an act
> that individual or a third person has committed or is suspected of having
> committed, intimidating or coercing that individual or a third person, or
> for any reason based on discrimination of any kind.

Pub.L. No. 102-256, 106 Stat. 73, § 3(b)(1)(1992) (codified at 28 U.S.C. § 1350 note § 3(b)).

While the precise circumstances of Peter Kilburn's captivity are not known because of his subsequent murder, Dr. Clawson (whose testimony the court credits and will treat as expert testimony) testified that he had no reason to believe that the circumstances of Peter's time as a hostage were any different from other captives of Hizbollah, such as Thomas Sutherland, Terry Anderson, or William Buckley. *See* Pls.' Proposed Facts ¶ 23. Such circumstances were "extraordinarily unpleasant" and included, *inter alia*, beatings, unsanitary conditions, inadequate food and medical care, and mock executions. *Id.*; *see also, e.g., Anderson*, 90 F. Supp. 2d at 109-111, 113 (describing similarly poor circumstances and qualifying them as "torture"); *Sutherland*, 151 F. Supp. 2d at 34-38, 45 (finding that "the deprivation of adequate food, light, toilet facilities, and medical care for over six years amounts to torture within the meaning of the FSIA); *Surette*, 231 F. Supp. 2d at 264-265 (finding that CIA agent William Buckley was "tortured" within the meaning of the FSIA when enduring similar conditions to those described here).

The harsh conditions of Peter Kilburn's confinement and the beatings he likely suffered constitute torture because Iran, through its directly-controlled surrogate, Hizbollah, treated Kilburn in this manner as a means to eradicate Western influence in Lebanon, particularly the heavily American presence at AUB. *See* Pls.' Proposed Facts ¶¶ 23, 42-43, 45-46. Thus, Iran supported Hizbollah's, actions in an attempt to intimidate the United States into lessening its involvement in Lebanon, qualifying the acts committed against Peter Kilburn as "torture" within the meaning of the TVPA. 28 U.S.C. § 1350 note § 3(b).

Finally, Kilburn was subjected ultimately to "extrajudicial killing" as defined in section 3 of the TVPA (28 U.S.C. § 1350 note) when Hizbollah sold him to the ARC with the knowledge

that he would be murdered in retaliation for the U.S. air strikes on Tripoli.  Pls.' Proposed Facts

¶ 25.  The TVPA defines extrajudicial killing as

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note.  Peter was purchased by the ARC from Hizbollah and summarily shot as

an act of retribution.  *See* Pls.' Proposed Facts ¶¶ 26-27.  Moreover, it was likely known by

Hizbollah that Peter would be killed because Libyan agents made it known that that was their

purpose in purchasing a hostage.  *Id.* at ¶ 27.  There is no evidence in the record that Peter's

killing was authorized by a previous judgment, and thus, he was subject to extrajudicial killing

within the meaning of the TVPA.

### 3. Provision of "Material Support or Resources" for Hostage Taking, Torture, and Extrajudicial Killing

Section 1605A(h)(3) defines "material support or resources" to have "the meaning given

that term in section 2339A of the title 18."  Section 2339A provides:

> 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation.

In determining whether a foreign state has materially supported terrorism, the court first

considers whether a particular terrorist group committed the terrorist act and second, whether the

defendant foreign state generally provided material support or resources to that terrorist group

which, in turn, contributed to the group's ability to carry out the terrorist act.  *See Ben-Rafael v.*

*Islamic Republic of Iran*, 540 F. Supp. 2d 39, 46 (D.D.C. 2008).

Courts often find such support to exist where experts testify (1) that the terrorist acts could not have occurred without such support; or (2) that a particular act exhibited a level of sophistication in planning and execution that was consistent with the advanced training that had been supplied by the defendant state; or (3) when the support facilitated the terrorist group's development of the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack. *Gates*, 580 F. Supp. 2d at 67-68 (citing cases). Moreover, the plaintiffs need not establish that the material support or resources provided by Iran for terrorist acts contributed *directly* to the act from which their claim arises. *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998) (referring to the pre-NDAA 28 U.S.C. § 1605(a)(7)) (emphasis added). Rather, sponsorship of a terrorist group which causes the personal injury or death of a U.S. national is sufficient to establish jurisdiction. *Id.*

It is undisputed that Iran provided material support for Hizbollah's terrorist activities in Lebanon, including its kidnapping, and torture of Peter Kilburn. First, Hizbollah, using its alias, Islamic Jihad, took responsibility for Peter Kilburn's kidnapping. *See* Pls.' Proposed Facts ¶¶ 19-22. Second, the factual record establishes that Iran provided material support in the form of funding and expertise in kidnapping that directly facilitated the abduction and detention of Peter Kilburn. *Id.* at ¶¶ 42-49. Not only did Iran play a central role in Hizbollah's founding, but it, in many circumstances, exerted direct control over the organization's activities, including the kidnapping of westerners. *Id.* at ¶¶ 43, 46-49.

More to the point, Hizbollah was not capable of holding Peter Kilburn hostage for nearly a year and a half *without* the expertise of Iran and MOIS in detaining hostages. *Id.* at ¶ 48; *Gates*, 580 F. Supp. 2d at 67-68. Dr. Clawson testified that MOIS transferred its hostage detention expertise to Hizbollah and that this wealth of knowledge was utilized in Peter's detention. Pls.' Proposed Facts ¶¶ 47-49. Further, Dr. Clawson stated that given the relatively

small size of Lebanon, Hizbollah was simply incapable of hiding Peter Kilburn from the search

efforts of Western intelligence agencies for such a long time period without the specific

direction, expertise, assistance, and funding of Iran and MOIS. *Id.* Indeed, many hostages held

by Hizbollah, such as Peter Kilburn, saw their captors wearing Iranian military uniforms and

speaking Persian. *Id.* at ¶ 23. Additionally, Iran provided Hizbollah between $50,000,000 and

$100,000,000 a year in funding during the time of Peter Kilburn's captivity, sums of money that

enabled Hizbollah to undertake such terrorist operations. *Id.* at ¶ 44; *Flatow*, 999 F. Supp. at 18

Thus, the record establishes affirmatively that Iran provided material support for Peter Kilburn's

abduction and detention at the hands of Hizbollah.

Additionally, several judges on this court have held explicitly that Iran sponsored − and

thus was vicariously liable for − Hizbollah's terrorist activities, especially in Lebanon. *See, e.g.,*

*Cicippio v. The Islamic Republic of Iran*, 18 F. Supp. 2d 62, 68 (D.D.C. 1998) (Jackson, J.)

(kidnapping and hostage taking in Lebanon); *Anderson*, 90 F. Supp. 2d at 114 (same); *Valore v.*

*Islamic Republic of Iran*, 478 F. Supp. 2d 101, 105 (D.D.C. 2007) (Lamberth, J.) (bombing of

the U.S. Marine barracks in Beirut, Lebanon); *Dammarell v. Islamic Republic of Iran*, 281 F.

Supp. 2d 105, 191 (D.D.C. 2003) (Bates, J.) (bombing of the U.S. Embassy in Beirut, Lebanon).

Through its provision of material support to Hizbollah, Iran and MOIS qualify as state sponsors

of terrorism within the meaning of the FSIA and are liable for the injuries suffered by the

plaintiffs as a result of Hizbollah's abduction and torture of Peter Kilburn.

### 4. Iranian Officials Provided Material Support While Acting Within the Scope of their Office

Additionally, the record demonstrates conclusively that members of MOIS and the

Iranian government provided direct support to Hizbollah as part of official state policy. Dr.

Clawson testified that the Iranian government helped found Hizbollah to create a more radical

Shia organization in Lebanon that it could exercise greater control over. Pls.' Proposed Facts ¶¶ 42-43 After Hizbollah's founding, Iran assisted the group in bombing targets associated with Western nations in the hopes of pushing Western influence out of Lebanon. *Id.* These efforts extended to kidnappings, where Iran was instrumental in aiding Hizbollah's efforts to take Westerners hostage, after directing such efforts. *Id.* at ¶¶ 43, 46-48. Further, hostages in Peter Kilburn's predicament often saw their captors wearing official Iranian military uniforms and speaking in Persian, further demonstrating that Iranian officials provided material support while acting within the scope of their office. *Id.* at ¶ 23.

Moreover, several decisions by this court establish that Hizbollah acted as an agent of the Iranian government and MOIS in committing terrorist acts in Lebanon. *See, e.g., Cicippio*, 18 F. Supp. 2d at 68; *Valore*, 478 F. Supp. 2d at 105; *Dammarell*, 281 F. Supp. 2d at 191. For instance, the court in *Sutherland* found that it was clear that Thomas Sutherland and his fellow captors were being held by Hizbollah at Iran's direction. *Sutherland*, 151 F. Supp. 2d at 37, 45-46. The court based this determination on the fact that Sutherland's captors were "very, very pro-Iranian" and that they wept openly upon the death of the Ayathollah Khomeini. *Id.* at 45-46. Thus, the record and the findings of other judges of this court demonstrate that Iranian officials provided material support for Hizbollah's terrorist activities, including kidnappings, while acting within the scope of their office.

### 5. Iran was a "State-Sponsor of Terrorism" at the time of Peter Kilburn's Kidnapping, Torture, and Subsequent Killing

Further, at the time of the filing of the original complaint pursuant to § 1605(a)(7), Iran − and thus its political subdivision, MOIS − had been designated as a state sponsor of terrorism. Indeed, Iran was first designated a state sponsor of terrorism on January 19, 1984, pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and section 620A of

the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and remains a state sponsor of terrorism to this day. A variety of factors, including the assassination of Malcolm Kerr and the earlier embassy bombing led to Iran being placed on the list. *Kerr,* 245 F. Supp. 2d at 63, n.11.

### 6. Peter and Blake Kilburn were U.S. Nationals at the Time of Peter's Abduction, Torture, and Killing

Finally, the record establishes that Peter and Blake Kilburn were, at the time of Peter's abduction, United States citizens. Pls.' Proposed Facts ¶¶ 4-5. Having found that the plaintiffs have presented sufficient facts showing that Iran is not immune from suit, this court finds that it may assert subject matter jurisdiction over the Defendants pursuant to 28 U.S.C. § 1605A(a)(1), and (2).

### D. Liability

The amendments to the FSIA terrorism exception provide a federal statutory cause of action against state sponsors of terrorism. *See* 28 U.S.C. § 1605A(c). Judge Collyer, in *Gates,* approached the question of liability by analyzing the facts of the case under the new § 1605A(c) cause of action framework while also simultaneously assessing whether the court had subject matter jurisdiction over a foreign sovereign under the FSIA. 580 F. Supp. 2d at 64-69. This approach is logical given that the § 1605A(c) cause of action is fulfilled by demonstrating that the foreign sovereign performed acts described in subsection (a)(1) of § 1605A, which addresses immunity and subject matter jurisdiction.

Although an analysis of a foreign sovereign's potential immunity and liability should be conducted separately, the elements of immunity and liability under § 1605A(c) are essentially the same in that §1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action. *Sutherland,* 151 F. Supp. 2d at 47; *compare* 28 U.S.C. § 1605A(a)(1), *with id.* §1605A(c). Thus, following the guidance of Judge Collyer's recent decision on liability in *Gates,* this court finds

additionally, that, as recounted in the court's sovereign immunity analysis above, the defendants are liable for economic, solatium, and pain and suffering damages for the personal injury and subsequent death of Peter Kilburn because they materially supported the acts described in § 1605A(a)(1), as carried out by Hizbollah.

### E. Damages

Section 1605A(c) allows plaintiffs to recover money damages, including economic damages, solatium, pain and suffering, and punitive damages.[2] Here, there is an understandable dearth of available information upon which to base precise damage calculations. This is attributable to several factors, including Peter Kilburn's death and his inability to testify about his captivity, and the death of his only immediate family member, Blake Kilburn. Nevertheless, this court has routinely applied pre-determined damages figures in FSIA terrorism cases both for the pain and suffering of the victim and the solatium damages of the family members. Considering the small amount of information available concerning Peter Kilburn's time as a hostage or his earnings, such an approach is appropriate here.

### 1. Economic Damages

There is very little information available concerning Peter Kilburn's earnings as an acquisition librarian and instructor of library sciences at AUB. Further, Peter Kilburn died at age 61, after a year and a half in captivity and a long tenure of service at AUB. Facts ¶¶ 14, 27. Thus, it is very difficult to calculate any precise amount of economic damage resulting from

---

[2] The plaintiffs are no longer seeking, and have waived, their request for punitive damages, as well as count five of the first amended complaint, "Trafficking in Slaves." Pls.' Proposed Facts at 32 n. 3.

Peter's death.  Moreover, the plaintiffs presented no evidence to support an economic damages

award.  As such, the court does not award economic damages.

## 2.  Pain and Suffering

In cases brought under the former § 1605(a)(7), this court developed a damage

calculation standard that grants former hostages roughly $10,000 per day of captivity in pain and

suffering damages.  *See Sutherland*, 151 F. Supp. 2d at 51; *Anderson*, 90 F. Supp. 2d at 113.  For

instance, in the case of Terry Anderson, a hostage held captive by Hizbollah for 2,450 days, the

court awarded him $24,540,000 in damages.  *Id*.  Similarly, the court awarded Thomas

Sutherland, a co-captor of Anderson's, $10,000 a day.  *See, e.g., Sutherland*, 151 F. Supp. 2d at

51; *see also Cicippio*, 18 F. Supp. 2d at 68 (awarding $20,000,000 to a hostage held by Hizbollah

for 1,908 days).  Moreover, the *Sutherland* court noted that this approach had obtained tacit

approval from Congress when it enacted the Victims of Trafficking and Violence Protection Act

of 2000, Pub.L. No. 106-386, § 2002, 114 Stat. 1464 (2000), which resulted in the payment of

certain terrorist victims at the rate of approximately $10,000 per day of captivity.  *Sutherland*,

151 F. Supp. 2d at 51.  This same approach is appropriate here.

The $10,000 per day figure is meant to compensate a former hostage for their intense

suffering, including, *inter alia*, loneliness, beatings, and a lack of hygiene.  *See id*.  Although

little information is available about the specific details of Peter Kilburn's 503-day captivity,

inferences can be drawn about its conditions based on the circumstances endured by other

hostages kidnapped by Hizbollah in Lebanon during the mid-1980s.  For instance, Terry

Anderson was regularly beaten, threatened with death, fed only bread, water, and the occasional

fragment of cheese, and was kept in unsanitary conditions that led to illness.  *Anderson*, 90 F.

Supp. 2d at 109.  Anderson and his fellow hostages, including Thomas Sutherland and Joseph

Cicippio, were blindfolded and chained  to a floor at all times and transported like cattle between

locations that were described as "filthy dungeon[s]." *Id.* at 110. The prisoners were given only a mattress, a water bottle, and a second bottle for urine. *Id.* All of the men imprisoned with Anderson developed diarrhea, but because they were chained to the floor, they were often forced to sit in their own excrement. *Id.* Further, the hostages were routinely taunted with assurances that they would be released shortly, but the hostages learned that the assurances were lies. *Id.*; *see also Sutherland*, 151 F. Supp. 2d at 33-37 (generally describing similar or worse conditions).

Peter Kilburn was abducted and held hostage by the same terrorist organization, Hizbollah, during the same time frame, as the plaintiffs in *Anderson*, *Cicippio*, and *Sutherland*. Pls.' Proposed Facts ¶¶ 19, 22-26. Therefore, it is reasonable to assume that Peter Kilburn experienced similar conditions to the hostages in those cases before being sold to the ARC. *See Surette*, 231 F. Supp. 2d at 269 (making a similar inference about Buckley, who was also murdered and, at times, held in the same facilities as Anderson, Cicippio, and Sutherland). Thus, applying the same damages standard as those in the relevant comparator cases, the court awards Peter Kilburn's Estate $5,030,000 for the pain and suffering he endured as a hostage.

Further, Peter Kilburn, like William Buckley, is entitled to additional compensation in the amount of $1,000,000 for the portion of his life that he spent facing certain death alone. *See Surette*, 231 F. Supp. 2d at 269. In *Surette*, Judge Friedman found that William Buckley was shot and killed by his captors after falling ill in the final days of his 444-day captivity. *Id.* at 264. To compensate for spending the final moments of his life facing certain death, the court awarded Buckley's estate an additional $1,000,000. *Id.* at 269 (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (awarding an extra $1,000,000 to victim's estate for the several minutes before and after victim was shot and before he died); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 8 (D.D.C. 2000) (awarding $1,000,000 each to two victims of suicide bombing who died quickly but not immediately after explosion)). Such an award is

appropriate in this case, where the record shows that Hizbollah transferred Peter Kilburn to the ARC for a cash payment of $3,000,000 so that the ARC could murder him in retaliation for U.S. air strikes against Libya. Thus, this court awards Peter Kilburn's estate an additional $1,000,000.

Accordingly, this court awards $6,030,000 in total compensatory damages to the Estate of Peter Kilburn.

### 3. Solatium

Section 1605A(c) expressly grants U.S. nationals and their personal representatives the ability to obtain solatium damages. *See* 28 U.S.C. § 1605A(c). Solatium is a compensatory damage belonging to individuals who, upon the death of a family member, suffer injury to their feelings and a loss of the decedent's comfort and society. *Gates*, 580 F. Supp. 2d at 71 (citation omitted). Such damages are awarded to close family members who demonstrate mental anguish, bereavement, and grief resulting from the decedent's death. *Id.*

The malice and political objectives motivating a terrorist act increase a plaintiff's solatium damages.

> The malice associated with terrorist attacks transcends even that of premeditated murder. The intended audience of a terrorist attack is not limited to the families of those killed and wounded . . . but . . . the American public, for the purpose of affecting [the] United States government . . . . The terrorist's intent is to strike fear not only for one's own safety, but also for that of friends and family, and to manipulate that fear in order to achieve political objectives. Thus, the character of the wrongful act itself increases the magnitude of the injury. It thus demands a corresponding increase in compensation for increased injury.

*Flatow*, 999 F. Supp. at 30. Defendants' conduct here was outrageous and certainly designed to strike fear into the heart of Peter Kilburn's family, making solatium damages appropriate.

Blake Kilburn was both a U.S. national and the legal representative of Peter Kilburn's estate, and thus, is eligible for solatium damages for the loss he suffered during and after Peter's abduction, torture, and murder. Pl.'s Proposed Facts ¶¶ 3; 28 U.S.C. § 1605A(c). Moreover, it is abundantly clear from his testimony that Blake was deeply impacted by the murder of his brother, with whom Blake was very close. Pl.'s Proposed Facts ¶¶ 29-34, 39-40. During his deposition, Blake, who had difficulty maintaining his composure while speaking of Peter's death, described his deep anger and sadness prompted by the fact that Blake would not be able to spend the final years of his life with his brother, the man who had served as best man at Blake's first wedding. *Id.* ¶¶ 32, 34, 40. Indeed, the record illustrates that the two brothers had become even closer in the years before Peter's abduction. *Id.* ¶ 34. Eventually, Blake's anger receded into an abiding sadness and sense of helplessness and it is clear that his feelings of loss remained even at the time of his deposition in 2001 and subsequent death in 2006. *Id.* ¶¶ 38-40.

The court follows the precedent set forth by other judges of this court who have awarded damages based on outrageous conduct that causes severe emotional distress in the family members of a victim of terrorism. *Surette*, 231 F. Supp. 2d at 270. The awards for siblings have ranged from $2,500,000 in solatium damages, *id.* at 273; *see also*, *Flatow*, 999 F. Supp. at 32; *Eisenfeld*, 172 F. Supp. 2d at 9-10, to $3,000,000 in *Stethem*, because of the tight knit nature of the family and the family's knowledge that the victim suffered intense pain immediately before his murder, 201 F. Supp. 2d at 91, to as much as $5,000,000 in *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 111-12 (D.D.C. 2000), where the decedent's brothers were very close and the decedent was akin to a father figure. Further, the duration of captivity played a role in generating a greater award for family members claiming loss of solatium. *Stethem*, 201 F. Supp. 2d at 9. A family member's "anguish is exacerbated when [they] must live with the knowledge

that their loved ones suffered horribly for an extended period of time either at the hands of their tormentors *or as a direct result of their terrorist acts*." *Id.* (emphasis added).

Awarding $5,000,000 in loss of solatium damages is appropriate in the instant case because (1) Peter Kilburn was held for a prolonged period of time, approximately 503 days; (2) Blake Kilburn was very close with Peter in the years before his death; (3) Blake and his family were essentially informed that Peter's release was imminent in early 1986 only for Peter to be murdered in the midst of negotiations for his release after Hizbollah transferred ownership of him to the ARC; and (4) Blake was aware of Peter's extensive health problems and how those problems likely compounded his suffering a long captivity. Pls.' Proposed Facts ¶¶ 18, 24-27, 34-38. Finding that these circumstances warrant a higher degree of compensation, the court, in its discretion, awards the Estate of Blake Kilburn $5,000,000 in solatium damages.

An Order consistent with these Findings of Fact and Conclusions of Law is separately and contemporaneously issued this 30th day of March, 2010.


RICARDO M. URBINA
United States District Judge